Alvarado v. Nordstrom Thank you. Yeah, you can fill it up. Thank you. That's nice of you. I can't lift that. That's great. Thanks. May it please the court, I'm Ann Wlodek for... You have... just wait for a second. The crowd is leaving. Don't take it personally. I'll try. And, um... I mean, not many people saw Moonlight, and it was the best picture of the year. I want to answer the last panel in terms of the appropriate relief. We want to get to appropriate relief. And I reserve three minutes. This is a little different than... Speak into the microphone. I'm sorry. It would be helpful. Thank you. Eddie Alvarado worked at Jeffrey selling high-end shoes for almost a decade. He was very successful. He earned commissions around $100,000 a year. He was compelled to leave Jeffrey after it became painfully obvious that his co-worker slurs and threats of violence would not be stopped by management. Alvarado felt physically threatened. He was stalked. He was berated because he is Hispanic and gay. While he saw the differential treatment between Hispanics and African Americans, it became clear why he was targeted. His primary tormentor, a straight African American woman, suggested, after following him around the store in the hopes of provoking him to fight with her, that she should cook him a roast campoyo, clearly a Latin dish. She also posted messages on Facebook. One read, I wish I could smack the shit out of some co-workers. The other said, Hashtag, stressful, want to kill my co-workers kind of day. Alvarado was told that she was looking to provoke him so that he would hit her and get fired. The facts in this case show that Mr. Alvarado was subjected to a hostile environment. He went to complain. His complaints were not met with any meaningful response. In fact, even more than the roast campoyo, we have evidence in the record that Mr. Siri, the head of the store, said to people, I am concerned and I have problems disciplining African Americans because I'm afraid they're going to sue me. So what he did with Mr. Alvarado, a ten-year employee, was to show him that with respect to what was going on in the store, despite reprimands, despite being told to stop, it didn't and there was incident after incident after incident. When you say incident after incident after incident, what other incidents are you pointing to? The district court and the defendant said that there were three. There were substantially more than that. There were Mr. Alvarado being called a miserable motherfucker after there had been an issue on the floor. The two Facebook comments and Mr. Alvarado was told that they couldn't tell her not to put them because of the First Amendment. He was called a little bitch. He was told that they had to choose between the real girls and queens. The other thing is these are just the ones that he told the employer. In the Arroz con Pollo incident, he made a fried chicken and sweet potato fries response. That's correct. Neither party was disciplined, right? What Mr. Alvarado said about that was it wasn't the Arroz con Pollo that was a slur, although it can be perceived as one. For him, it showed him why he was being treated by her and others with a kind of reaction and threat, and it wasn't until the Arroz con Pollo that it fit that this was really— Is there any other evidence of anti-Hispanic bias by anybody? Yes. Which is that? There is bias against—there were a couple of people who resigned who when they did, they said that they had to leave before they became too bitter. In one of the first conferences with the court, the— That was Mr. Bravo. Yes, and he said goodbye to Mr. Siri. He kept open some lines of communication, but he made it very clear to Mr. Alvarado and to others that they could not feel protected. Is that evidence of anti-Hispanic bias that Mr. Bravo quit? It is when he quit because there was hostility by some of the African-American employees that the store would do nothing wrong. What's the actual evidence of—I mean, I suppose Mr. Bravo could be mistaken. That's just his opinion. Is there any evidence in the record other than the Arroz con Pollo comment where anybody said anything about Mr. Alvarado's ethnicity? Or Mr. Bravo's, for that matter. The comment by Mr. Siri, who was the head of the store, that he had difficulty with disciplining African-Americans showed that also he was concerned, and it's in the record already, that if he found that a Hispanic should not be written up for the same incident, that he would be accused of favoritism. So that he decided that the way to do whatever the potential writing up was was to not favor or make it look like he was not favoring anybody who was Hispanic and he would do the opposite with an African-American. And it is the people who were concerned about some of the comments who tried to break up fights aligned along racial lines. And I think one of the things that happened with the district court and the defendant is that the reaction was that there were three comments. There may have been three explicit comments that were reported to management, but there were not only others and some in the record. In the Arroz con Pollo comment, and please correct me if I got this wrong, that comment doesn't appear to be in the written complaint to Nordstrom or in the interview with investigator Kelly Lane. That's exactly right, and, in fact, I think that shows. Why didn't he report? I mean, if there was a concern, why do you think that he would report that? I think in terms of a concern, what happened here, and it happens in other cases as well, is that you know somebody is treating you badly. You may not know why. For him, and the discovery shows this, the Arroz con Pollo was more of an ah-ha, now I understand why you've been treating me badly. And he reacted with the fried chicken, which is not a great thing for him to have done, but they were each essentially saying through the food, okay, this is a Latin dish, I get it. I understand that, but I guess my question is, why wasn't it in his written complaint to Nordstrom or in the interview with investigator Lane? Because he was not saying, well, first of all, the initial complaint about the food was by Keisha Daniel, and so she is the one who brought it to management. Mr. Alvarado said that he said what he said, but he didn't officially complain about that, other than to say that this was the beginning of what was happening. That comment links Daniel, right, to the alleged discriminatory conduct? She was actually, I think in his mind, the aggressor. She was the one who told people that she wanted to start a fight so he would hit her and provoke . . . she would provoke him, and that happened, and that was one of the incidents that the district court did not see as harassment. The defendant called squabbling, where Mr. Alvarado was told over and over and over again something until he said, leave me alone, you've told me . . . Counselor, your argument, as I understand it, is that this working on the floor, selling these shoes, became so hostile, such a hostile environment, that Mr. Alvarado couldn't bear it. He had physical manifestations. He had an anxiety attack. He had, for more than a decade, done what he loved to do. It's not that he would have that many options to do other things. Speak into the microphone. He worked with everybody. I'm sorry. Speak into the microphone. Oh, I'm sorry. He worked with everybody, and he worked well with every person, color or not. It just, all of a sudden, his life changed. And management not only did nothing, they used the reprimands in such a way that people were told that they would be written up, and then they were told, if you do this again, you'll be written up again, to the point where Ms. Daniel and another person said, they're never going to fire us. We know it. The other thing I think about the Arroz con Pollo is that it was something that made it clear, in some ways, that there was a division on the floor. And rather than do anything to try and heal that and to try and do something to make it better, management would say to Mr. Alvarado, if you don't like it, you can leave. There's a different point. Is there any evidence in the record that suggests that the surveillance cameras were trained at that part of the sales floor where the dispute occurred? The evidence is only that Mr. Alvarado, right after the fight, was accused of having raised his hand, and he said he didn't. And he went to Mr. Seary and said, look at the tape. Look at the tape. That's it. There was, in his mind, a tape. It was the selling floor. He was accused of raising a hand, which he said he didn't. And his answer was, look at the tape. And then it was gone. Well, wait. That's a jump, right? He said, look at the tape, and it was gone. It may never have existed. Is there any evidence that there was a taping system that would have captured this incident? It was his understanding at that time that there was, when he said, keep the tape. When he asked to have Mr. Seary watch the tape, he did not get a tape. So whether it was there or not, there were cameras all over. They said they had one in the jewelry department. They had one in the break room where they watched Ms. Daniel eat. And we did ask the defendant, and we didn't get it. And then we were told that that part is not with the tape. But it was definitely Mr. Alvarado's understanding, after a very long time of working there, that there was. I think with respect to the problem with what was going on was that there was not only no attempt to try and resolve the complaints or to make the environment better, it became one where more people became involved on either side. More people left because they felt that there was the potential for harm and the potential for violence. And the constructive discharge, when an employer after ten years says to you, if you don't like it in response to the fact that the complaints weren't being dealt with, if you don't like it, you can quit. If you're not happy, you can leave. And he did. And other people did. And I think when the court reviewed the evidence, it was not in the light most favorable to Mr. Alvarado. The inferences were not drawn in his favor. There, in fact, it is unusual to have a case where you have the actors, the heads of the company, saying, we're afraid to do anything about African Americans, and he's afraid that it'll look as if they're favoring the Hispanic. That, to me, is something that at least would be a ticket to a jury. At least a jury should decide, is that what motivated this? Did the management do the right thing? And the only issue on that is the district court made it very clear that in the court's view, progressive discipline was mandated by law and had to be followed. And not only is that not correct, but contrary to the opinion, if a review or a warning is used in a way that shows some kind of discrimination, then that, too, becomes a factor that should be decided by a jury. Thank you. If it pleases the court, my name is James Weller. I'm here on behalf of Jeffrey and Nordstrom. The fact of the matter is that there were two incidences by non-supervisory employees that were reported to management in March and June of 2011 that involved a discriminatory overtone to them. The fact is also that in response to those comments, my client undertook immediate action in connection with them. Now, Judge Lynch, you had asked about the exchange where Arantz-Campolo, which was met with a response of serving fried chicken. Both of the individuals involved, Ms. Daniels and Mr. Alvarado, were verbally reprimanded for that, and that conduct never occurred again. When you had another... You talked about food? Is that what you're saying? Well, there were never any additional comments made by Ms. Daniels that had any type of... There was a relationship between Ms. Daniels and Alvarado that seemed to escalate. A hostile relationship? Your Honor, Judge Pooler, there's no question that these two people didn't like each other. But I think that what this Court has been consistent in saying in any number of cases is that there has to be some demonstration that the hostility is based on hostility towards a protected characteristic. And you don't have that here. That's the significance of the Arantz-Campolo. So you have one comment in March of 2011, and from that they extrapolated everything else that followed was... Well, this is a baseline information about why there was such hostility. But the Court has said over and over again that when you consider facially neutral events, subsequent events, such as the encounter in January 2012, there has to be some evidence to show that those ongoing confrontations have some type of an animus generated and based on a protected characteristic. You don't have that. You have one comment by Ms. Daniels in March of 2011. There's no indication in any of the other exchanges, any of the other encounters, that she's targeting Mr. Alvarado because she doesn't like Hispanic gay individuals. She said to him to his face, you don't belong here. I'll leave out the second part of that. She said to him in the break room, you don't belong here. Those all occurred on one day in March of 2011, Your Honor, and the Facebook posting appears to have been sometime within a few days of that. That's the extent of it. Where is the showing that the subsequent issues with Keisha Daniels and Mr. Alvarado had anything to do with the fact that Mr. Alvarado is Hispanic and gay? What about your adversary notes that plaintiff alleges that, and I'm quoting, told by John Seery that it's difficult to deal with allegations of misconduct against African-American employees because he feared it might appear racially motivated. Isn't this evidence that management thought or felt that it had to treat African-American employees differently from non-African employees? I think it indicated that there may have been a pause on Mr. Seery's part, but his actual conduct demonstrates even-handedness discipline to the African-American employees. Keisha Daniels was written up for the Facebook postings once those were brought to management. But under the standards of the NYCHRL, which I know you're well familiar with, it's an expansive definition of unlawful retaliation. It says, to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action. Why isn't that possibly this case here, or why isn't there at least a jury question? Judge, I think that my client did everything right here. They brought in outside individuals to analyze what was going on there. They brought in Kelly Lane. She worked closely with a fellow named Jerzy Romanofsky. They interviewed everybody. You have Mr. Seery, the store manager. He might ultimately prevail, but the question is at this stage, why isn't that? Because he really didn't play a material role in the investigation. He was interviewed.  She spoke with Mr. Romanofsky about what had happened. They determined based upon. Did she ask Seery whether he told plaintiff that he was uncomfortable disciplining African-American employees? Judge, I don't remember if she did or not. I know she took very copious notes, and those are all in the record. Curious question. I'm not sure how it plays. Suppose we thought that management was unfairly favoring African-American employees. Now, I take it Mr. Alvarado claimed that he was discriminated against on the basis of ethnicity and sexual orientation. It's not a claim of racial discrimination. If this is a case of unfair favoritism towards African-Americans as against everybody else, is that different than a claim of discrimination on the basis of Hispanic ethnicity? I think it's sort of the flip side of the issue. The problem that I have, which you've also highlighted in your questioning of the appellant, is if this in fact was an atmosphere that was rampant with prejudice towards Hispanics who were also gay, what about Mr. Bravo? So Mr. Bravo is interviewed by Kelly Lane as part of that investigation where she's trying to determine if there is a hostile work environment, and he talks about the fact that he had had a couple of encounters with Keisha Daniels, but they'd worked it out. He is specifically asked, does John Seery discriminate? And he says no. On the way out the door several months later when he's leaving the company in his exit interview, and this is in Mr. Seery's notes, he talks about how he hopes that they'll work together again in the future, and he hugs him as he's leaving. So to me, that point in and of itself would seem to undermine on an objective basis the idea that this is a hostile work environment at Jeffries. If you don't have any other questions, I would stop. I just have a microphone to get to. I think part of the problem here is the defendant's belief that they did everything right. It is hard to say that you're dealing with a problem when you're not changing in any way the environment. You're not doing anything so that people feel that they have to change the environment. They brought in people to try and find out what was wrong with the environment, and they got no guidance as to what to do to change. Well, I think it was Nordstrom. It's more that they are part of the ownership of the company. Their discussions with the Jeffrey people were also, do we fire Alvarado and Keisha? They were treating Mr. Alvarado in the same way as they were treating Ms. Daniel. Even though it's you. And talking about whether to favor or whether it would look like favoring one group or the other. And I think with respect to Mr. Bravo, not only did he say that he was leaving before he became bitter, and that is in the record, there was a concern about health and other issues. Did he say he was leaving before he became bitter about being discriminated against on the basis of being Latino? He did not say that. He said before he was bitter. So why is that any evidence, even if we were to just credit his opinion, whatever it is, why is that any evidence that he believed that he was being discriminated against? He referred to Mr. Alvarado, some of the comments that he had heard about African American provocation of some of the Hispanics, including Mr. Alvarado. I think when he was talking about what was going on generally, that is when he said I have to leave before I become bitter. He saw what happened to Mr. Alvarado with the anxiety attacks and the like. And I just think my concern about what Jeffrey is saying here is that in order to have a hostile environment, you would have to say each time, and use any of the words there, you are such and such because you are Hispanic. Isn't the real problem here what the employer did? If Keisha Daniel is bigoted or Keisha Daniel misbehaves, that's a fellow employee. So what we have to find is that a reasonable jury could conclude that there was a hostile environment that was attributable to the employer. The employer, yes, that's correct. We don't have an individual claim against Ms. Daniel. We do not have any specific claim against her. I do think there are issues with respect to the violence or the potential violence that are When we talk about escalating situations, she does these Facebook posts in March and June of 2011. Is there any reference to any kind of violence in the year that follows that before Ms. Alvarado leaves? The fight on the floor with the tape was after that. That's a physical fight or a threat of physical violence? I thought Mr. Alvarado was accused of raising his hand, which he denies. Was there somebody else? That was the fight that Ms. Daniel was taken out of the store by. Yes. There were also comments She was taken off the floor and she was given a written reprimand after that episode. That's correct. And the issue on that was also that Mr. Alvarado was given a reprimand. And it was that one reprimand that the district court said could be an adverse action, but this court did not feel that it was strong enough, but that there was a potential reprimand for something that was done earlier and the intervening event was a formal complaint to management and Nordstrom about the harassment. Thank you. Thank you. Thank you very much. Thank you both for your arguments. The court will reserve decision. Thank you.